UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>VINCENT STEVEN BOOTH, LOUISE Q. BOOTH, MICHAEL SCOTT IOANE, ACACIA CORPORATE MANAGEMENT, LLC,  MARIPOSA HOLDINGS, INC., AND ALPHA ENTERPRISES, LLC,<br><br>Defendants | CASE NO. 1:09-CV-1689 AWI GSA<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

**I. Findings of Fact**

1. The parties in this case are the United States of America ("United States"), State of California Franchise Tax Board ("FTB"), Vincent Steven and Louise Q. Booth ("Booths"), Michael Scott Ioane ("Ioane"), Alpha Enterprise LLC, Acacia Corporate Management LLC ("Acacia") and Mariposa Holdings Inc. ("Mariposa").  The United States is the plaintiff; all other parties are defendants.  This case concerns the ownership of three properties: 5705 Muirfield Drive, Bakersfield, CA ("Muirfield"); 5717 Roundup Way, Bakersfield, CA ("Roundup"); and 1927 21st Street, Bakersfield, CA ("21st Street") (collectively the "Subject Properties").  This case, Civ. Case. No. 09-1689, is related to two other cases, Civ. Case Nos. 07-1129 and 12-0171.  The present case is the first to come to trial.

2. Vincent Booth has been a chiropractor for over thirty years.  Vincent and Louise Booth

have been married since 1989; they have four children together. Trial Transcript, 42:18-43:7.

3. Vincent Booth purchased Muirfield, a townhouse/condominium, in 1986 with a mortgage. The Booths fully paid off the loan in 1992. The Booths lived at Muirfield until December 1994. Thereafter, the Booths leased out Muirfield, receiving proceeds from the rent. In addition, Vincent Booth's mother lived at Muirfield for a short while. Trial Transcript, 47:12-52:1. Joint Exhibits 301, 302, and 304.

4. The Booths purchased Roundup, a single family residence, on December 29, 1994 with mortgage from World Savings and Loan Association. The Booths fully paid off the loan using proceeds of Vincent Booth's chiropractic practice in 2002. The Booths have lived at Roundup from December 1994 through the present. Trial Transcript, 43:8-47:11 and 279:23-280:12; Joint Exhibits 305, 206, and 325.

5. The Booths attended a seminar held by the National Trust Services in San Jose, California in 1995. The purpose of attending the seminar was to learn how to avoid paying taxes. Trial Transcript, 58:17-60:10 and 282:10-283:19.

6. The Booths did not pay federal income taxes for 1995-1997. The Booths and the United States have come to a settlement as to those liabilities (tax, interest, and penalties): the Booths agree to pay the United States $653,314.71 plus interest from February 28, 2013. Doc. 154.

7. The Booths did not pay state income taxes for 2000-2002. The FTB claims the Booths owe $153,573.50 as of May 15, 2013 for the tax years 2001-2002. The amount owed for tax year 2000 has been resolved. Joint Exhibit 407.

8. At the National Trust Services seminar, the Booths formed the Alpha Omega Trust, Aligned Enterprises Trust, and Agape Trust with the assistance of James Baker, a person affiliated with the seminar organizers. The Booths were trustees of these three trusts. Any monies put into them came from Vincent Booth's chiropractic practice. The Booth children were the beneficiaries of Alpha Omega Trust; the Alpha Omega Trust was the beneficiary of the Aligned Enterprises Trust and the Agape Trust. Trial Transcript, 58:17-60:19, 61:22-

62:25, and 282:10-283:19; Joint Exhibit 406.

9. Louise Booth quitclaimed her interest in Roundup to Vincent Booth on July 16, 1996. Vincent Booth then quitclaimed his interest in both Roundup and Muirfield to the Alpha Omega Trust on July 22, 1996. Trial Transcript, 69:12-22 and 283:24-284:1; Joint Exhibits 307 and 308.

10. The Booths received nothing from Alpha Omega Trust in exchange for Roundup and Muirfield. Trial Transcript, 284:2-8.

11. In through the mid-1990s, Vincent Booth's chiropractic practice was located in rented office space at 21st Street, a commercial building. In July 1996, Vincent Booth as trustee of the Aligned Enterprises Trust, purchased 21st Street with a loan from Reinhilde Schwartz, the seller. The Booths paid off the loan with proceeds from the chiropractic practice. Louise Booth said she thought of the Aligned Enterprises Trust as just another means by which the Booths could own property. Vincent Booth's chiropractic practice remained at 21st Street until 2006. Trial Transcript, 55:1-58:16, 137:13-17, 188:16-189:25, 280:22-281:1, and 286:15-17; Joint Exhibit 309.

12. The United States contacted the Booths concerning their income tax obligations in 1998. The Booths then contacted Ioane on the recommendation of James Baker. Trial Transcript, 71:15-72:13.

13. Ioane worked for the Booths for several years. Ioane characterizes their relationship as: "we had a retainer agreement....if they have documents they want me to prepare, I would prepare them, and it also has in that agreement that they were required to speak to their attorneys and CPA to confirm that the documents were correct. So whatever documents Mr. Booth or Mrs. Booth asked me to prepare for them, I would prepare for them in accordance with our retainer agreement....we were in the business of preparing documents and selling trusts." Trial Transcript, 401:25-402:1, 415:2-11, and 419:17-19.

14. The Booths paid Ioane between $70,000-$100,000 per year for five or six years from 1998 on. The Booths hired Ioane to help them deal with the United States' tax inquiries and to avoid paying income tax due from prior years. Trial Transcript, 75:24-76:9, 83:19-84:17,

3

and 292:25-293:18.

15. Ioane advised that the Booths should put liens on the Subject Properties to shield them from the United States. Trial Transcript, 92:2-13; United States Exhibit 21.

16. The Booths created Southern Financial Trust. Vincent Booth's coworkers, John Innis and Tomas Rios, were the trustees of Southern Financial Trust. John Innis signed Southern Financial Trust documents at Vincent Booth's direction without reading their contents. Trial Transcript, 95:23-96:9, 97:21-25, and 104:9-105:7, 225:20-226:14.

17. The Booths created liens on the Subject Properties in 2000. In these liens (one for each of the Subject Properties), the Booths, as trustors and trustees of the Alpha Omega Trust and Aligned Enterprises Trust, promised to pay Southern Financial Trust $4,166.67 per month for 60 months. Each lien was notionally for $500,000 transferred from Southern Financial Trust to Alpha Omega Trust and Aligned Enterprises Trust for a total of $1.5 million. No actual money ever changed hands. Southern Financial Trust never paid $1.5 million and the Booths never made any monthly payments to Southern Financial Trust. Trial Transcript, 92:18-103:10; Joint Exhibits 315, 316, and 318; United States Exhibit 50.

18. Meanwhile, the United States filed a notice of federal tax lien against the Booths, recorded on March 15, 2000. The United States had made tax assessments against the Booths in October and November 1999. Trial Transcript, 338:25-339:2 and 610:21-611:4; Joint Exhibit 317.

19. The Booths substituted Tomas Rios and Lorne McCan, Vincent Booth's coworker and friend, as trustees of Alpha Omega Trust and Aligned Enterprises Trust in July 2000, after the liens on the Subject Properties in favor of Southern Financial Trust were created. Tomas Rios and Lorne McCan gave Vincent Booth signature stamps to use to sign documents for him. Lorne McCan signed documents the Booths gave him without knowing their purpose. Trial Transcript, 200:20-201:16 and 211:14-212:20; Joint Exhibits 320, 321, and 322.

20. Sometime in 2000, the Booths then formed the Bakersfield Properties and Trust Company. The Booths set it up for the purpose of holding the Subject Properties. Jean Liascos,

Louise Booth's sister was named the trustee. Jean Liascos was told what to do and what to sign with respect to Bakersfield Properties and Trust Company by Vincent Booth. Trial Transcript, 120:15-121:12, 123:3-15, and 243:13-20; United States Exhibit 26.

21. Alpha Omega Trust and Aligned Enterprises Trust transferred the Subject Properties to Bakersfield Properties and Trust Company; the transfers were signed by Tomas Rios and Lorne McCan as trustees for Alpha Omega Trust and Aligned Enterprises Trust on August 2, 2000 but were not recorded until January 11, 2002. No money exchanged hands in the transactions. Trial Transcript, 128:7-131:25; Joint Exhibits 322, 323, and 324.

22. Acacia was founded in April 2003 and is owned by Ioane's children. Steven Stucker was the manager. He described his role as a nominee officer of Acacia, "we have really no power to make decisions or act independently of the - either the stockholders of the corporation or the person who signs the agreement with the nominee. That person or the stockholders would give the direction, and they are the ones who - who are responsible for what actually happens. They make the decisions on behalf of the company." Steven Stucker took direction from Ioane for his actions as nominee officer of Acacia. Trial Transcript, 348:23-350:9, 354:8-14, 358:1-5, 500:8-9.

23. Bakersfield Properties and Trust Company transferred the Subject Properties to Acacia on December 5, 2005. Acacia in turn transferred a 5% interest in each of the Subject Properties to Ioane; the transfer was signed the next day, on December 6, 2005 but was not recorded until March 3, 2011. Vincent Booth and Jean Liascos, who signed the transfers on behalf of Bakersfield Properties and Trust Company, state that no money exchanged hands in the transactions. Jean Liascos further did not believe the transfers were sales or real changes in ownership. The Booths transferred the Subject Properties to Acacia to further distance them from the United States' efforts to collect tax payments. Trial Transcript, 133:6-134:19, 136:23-137:4, and 264:4-265:7; Joint Exhibits 341, 342, 343, 365, 366, and 367.

24. Ioane states that Acacia gave Bakersfield Properties and Trust Company a total of $5,000 in exchange for the Subject Properties, but there is no documentation supporting his claim.

The court finds this testimony to be non-credible. Trial Transcript, 432:6-12.

25. The United States filed notices of federal tax liens on the Subject Properties, recorded on December 22, 2005. Joint Exhibits 344, 345, and 346.

26. As of 2007, the Booths were still paying Ioane to help them keep the Subject Properties from the United States tax authorities. To that end, Acacia and Ioane sued the Booths and Bakersfield Properties and Trust Company over legal ownership of the Subject Properties in Civ. Case No. 07-1129. Acacia, Ioane, the Booths, and Bakersfield Properties and Trust Company entered into a collusive stipulated settlement quieting title to the Subject Properties in favor of Acacia and Ioane to further the Booths efforts to keep the Subject Properties out of the hands of the United States. Trial Transcript, 151:12-153:12; United States Exhibit 45.

27. The FTB filed a notice of state tax lien against the Booths, recorded on March 17, 2008. Joint Exhibit 408.

28. Mariposa was a trust originally initiated by Vincent Booth but not used by him personally. Instead, he turned it over to Ioane to set up and use. Trial Transcript, 148:4-149:2.

29. The Booths invested in a property development project with Treble LLC in 2004. The Booths agreed to pay $10,000 a month (through Southern Financial Trust) for a total of $950,000 to Treble LLC, and transferred the liens on the Subject Properties (beneficiary Southern Financial Trust) to Treble LLC as collateral. Vincent Booth told Robert Bell, a partner of Treble LLC and its developer, that Ioane represented the Booths in dealing with Treble LLC. The Booths fell behind on their payments in 2006. The Booths had invested a total of approximately $490,000 into Treble LLC. To resolve the problem, Treble LLC came to an agreement with Southern Financial Trust to end and repay the Booths' limited investment. The United States contacted Treble LLC about the Booths' tax problems, and levied on Southern Financial Trust's payout from Treble LLC. In December 2005, Ioane told Robert Bell that Southern Financial Trust's interest in the development project was being transferred to Mariposa. To extricate Treble LLC from the tax controversy, Robert Bell agreed to pay Mariposa a total of $427,000 and to transfer the liens on the Subject

Properties to Mariposa on June 9, 2009. At the time he made the agreement, Robert Bell believed that the Booths controlled Mariposa and that Southern Financial Trust's interest in Treble LLC was being transferred to Mariposa. The United States then levied on the payout Mariposa received from Treble LLC. Trial Transcript 140:22-148:3, 490:11-22; 503:20-25; 551:6-552:8, 555:8-10, 577:19-23, 581:13-586:6, 590:14-593:11, and 606:1-25; Joint Exhibits 331, 335, 337, and 338; Ioane, Acacia, and Mariposa Exhibit 224.

30. Mariposa transferred some interest in one of the Subject Properties to Alpha Enterprises LLC. However, that interest was reconveyed to Mariposa. Trial Transcript, 505:3-25.

31. Ioane and the Booths were indicted on various tax evasion charges on April 9, 2009. Vincent Booth plead guilty and testified against Ioane at trial. Charges against Louise Booth were dropped. Ioane was convicted in a jury trial on October 3, 2011. Trial Transcript, 154:3-15. United States Exhibits 53, 54, 55, and 56.

32. Throughout the period of these various transfers, the Booths resided at Roundup. A rental agreement between the Booths and Acacia was signed December 7, 2005. Steven Stucker states that Ioane told him Acacia was collecting rent on the Subject Properties. Ioane himself states that he "assume[s] that Acacia is [collecting rent]....I have pretty strong knowledge that they collect rent." Louise Booth states that Acacia and Ioane are currently collecting rental payments on Muirfield and 21st Street. Trial Transcript, 51:10-52:1; 70:3-19; 181:17-182:3, 262:20-22, 385:9-386:6; 389:2-9, 473:19-474:5, 637:14-639:5; Joint Exhibit 380.

33. This suit was filed on September 24, 2009. Doc. 1, Complaint.

## II. Conclusions of Law

34. "Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun- (1) within 10 years after the assessment of the tax." 26 U.S.C. § 6502(a). The taxes the United States are seeking to collect from the Booths were assessed in October and November 1999. This

suit was filed within ten years of the relevant assessments.

35. "'A nominee is one who holds bare legal title to property for the benefit of another'... in making nominee determinations in a tax lien context, we must 'look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach.'" Fourth Inv. LP v. United States, 720 F.3d 1058, 1066-67 (9th Cir. 2013), quoting Scoville v. United States, 250 F.3d 1198, 1202 (8th Cir. 2001) and Drye v. United States, 528 U.S. 49, 58 (1999). Under California law, a nominee ownership relationship is determined by considering six factors in a totality of the circumstances test with no single factor being dispositive: "(1) whether inadequate or no consideration was paid by the nominees; (2) whether the properties were placed in the nominees' names in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominees and the transferor; (4) failure to record the conveyances; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property." Fourth Inv. LP v. United States, 720 F.3d 1058, 1070 (9th Cir. 2013).

36. The Booths transferred Muirfield and Roundup to Alpha Omega Trust. Alpha Omega Trust paid no consideration. They were transferred in anticipation of impending litigation involving the Booths' tax liability. The relationship between the Booths and Alpha Omega Trust was close. The transfers were recorded. The Booths retained possession and benefit of the properties. Under the totality of circumstances, Alpha Omega Trust was a nominee of the Booths and the transfers were shams.

37. The Booths purchased 21st Street for the Aligned Enterprises Trust. Aligned Enterprises paid no consideration. 21st Street was purchased in Aligned Enterprises Trust's name in anticipation of impending litigation involving the Booths' tax liability. The relationship between the Booths and Aligned Enterprises Trust was close. The transfer was recorded. The Booths retained possession and benefit of the properties. Under the totality of circumstances, Aligned Enterprises Trust was a nominee of the Booths and the transfer was a sham.

38. The Booths created liens on the Subject Properties for the benefit of Southern Financial Trust. Southern Financial Trust paid no consideration for the benefit. The liens were created in anticipation of impending litigation involving the Booths' tax liability. The relationship between the Booths and Southern Financial Trust was close. The transfers were recorded. The Booths retained possession and benefit of the Subject Properties. Under the totality of circumstances, Southern Financial Trust was a nominee of the Booths and the transfers were shams.

39. Alpha Omega Trust and Aligned Enterprises Trust transferred the Subject Properties to Bakersfield Properties and Trust Company. Bakersfield Properties and Trust Company paid no consideration for the benefit. The transfers took place after the United States recorded a notice of tax lien against the Booths and in anticipation of impending litigation involving the Booths' tax liability. The relationship between the Booths and Bakersfield Properties and Trust Company was close. The transfers were recorded. The Booths retained possession and benefit of the Subject Properties. Under the totality of the circumstances, Bakersfield Properties and Trust Company was a nominee of the Booths and the transfers were shams.

40. Bakersfield Properties and Trust Company transferred the Subject Properties to Acacia which then transferred a partial interest to Ioane. Acacia and Ioane paid no consideration for the benefit. The transfers took place after the United States recorded a notice of tax lien against the Booths and in anticipation of impending litigation involving the Booths' tax liability. The relationship between the Booths and Acacia and Ioane was close. The transfers were recorded. The Booths retained possession of Roundup, though Acacia and Ioane began collecting rent from the Subject Properties. Though the evidence surrounding this transfer is more divided, under the totality of the circumstances, Acacia and Ioane were nominees of the Booths and the transfers were shams.

41. Southern Financial Trust transferred the interest in the investment with Treble LLC (secured by benefit of the liens on the Subject Properties) to Mariposa. Mariposa paid no consideration for the benefit. The transfers took place after the United States had levied on

proceeds from Southern Financial Trust's investment in Treble LLC. At the time, the relationship between the Booths and Ioane, who controlled Mariposa was close. The Booths retained possession of Roundup, though Acacia and Ioane began collecting rent from the Subject Properties. Though the evidence surrounding this transfer is more divided, under the totality of the circumstances, Mariposa was a nominee of the Booths and the transfer was a sham.

42. All of the transfers of the Subject Properties were shams. "A sham contract is a pretense undertaken for the purpose of deceiving a third party." FPI Development, Inc. v. Nakashima, 231 Cal. App. 3d 367, 401 n.18 (Cal. App. 3d Dist. 1991). In equity, these sham transfers are set aside as they were intended to be void in the first place. See Saks v. Charity Mission Baptist Church, 90 Cal. App. 4th 1116, 1134 (Cal. App. 2d Dist. 2001) ("it was intended to be void, i.e., a sham not intended between the parties as a jural act.... the notes were a sham, put together in order to fool the City, intended to have no legal impact as between the parties"), citations omitted. Thus these entities are deemed to have no interest in the Subject Properties. See United States v. Boyd, 2005 U.S. Dist. LEXIS 18466, *3-4 (E.D. Cal. 2005) (entity that is "mere nominee and/or alter ego" of transferor has no interest in the property).

### III. Order

43. The United States' tax liens attach to the Subject Properties; the United States' claims have priority. The United States may satisfy the Booths' federal tax obligations on the Subject Properties.

44. The court makes no determination between the Booths and the FTB as to which party's claims have priority to the Subject Properties, the proceeds of liens attached to the Subject Properties, or the proceeds from the sale of the Subject Properties.

45. Ioane, Acacia, Mariposa, and Alpha Enterprises LLC have no legal interest in the Subject Properties, the proceeds of liens attached to the Subject Properties, or the proceeds from the sale of the Subject Properties.

IT IS SO ORDERED.

Dated: January 10, 2014

SENIOR DISTRICT JUDGE